**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GERALD J. BARON, | CASE NO. 1:15-cv-02305-CCC-GBC |
| | |
| | (CHIEF JUDGE CONNER) |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| | |
| | REPORT AND RECOMMENDATION |
| CAROLYN W. COLVIN, | TO VACATE THE DECISION OF |
| COMMISSIONER OF | THE COMMISSIONER AND |
| SOCIAL SECURITY, | REMAND FOR FURTHER |
| | PROCEEDINGS |
| | |
| Defendant. | Docs. 1, 4, 5, 8, 11 |

## REPORT AND RECOMMENDATION

### I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Gerald J. Baron ("Plaintiff") for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act") and Social Security Regulations, 20 C.F.R. §§404.1501 *et seq.*, §§416.901 *et. seq.*[1] (the "Regulations").

Plaintiff alleges that he is unable to perform light work, which would render him disabled under the Act because of his age. Doc. 5. He underwent knee surgery

---

[1] Part 404 governs DIB, Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

in May of 2012 and alleges onset in April of 2012. Doc. 5. Medical experts, including Plaintiff's treating source, opined that Plaintiff could perform light work in opinions authored through September of 2012. Doc. 5. No subsequent medical evidence existed in the record at the time of the ALJ hearing in March of 2014; Plaintiff testified that he was unable to afford subsequent treatment because he was uninsured. Doc. 5. Plaintiff reported in October of 2012 and testified in March of 2014 that his condition had deteriorated since September of 2012. Doc. 5. Plaintiff's ex-wife corroborated his testimony at the hearing. Doc. 5. The ALJ ordered a consultative examination because it had been "so long" since Plaintiff received treatment, so that the ALJ could have a "fresh opinion." Doc. 5.  The consultative examiner also opined that Plaintiff had greater limitations than those assessed through September of 2012. Doc. 5.

The ALJ rejected all of the evidence after September of 2012 indicating that Plaintiff had deteriorated and found that Plaintiff retained the functional capacity he had in September of 2012. Doc. 5. In doing so, the ALJ rejected Plaintiff's testimony, his ex-wife's testimony, and the consultative examiner without any contrary evidence indicating that Plaintiff had not deteriorated. Doc. 5. This allowed the ALJ to deny benefits without having to hold a supplemental hearing after the consultative examination, because the ALJ could rely on vocational

evidence from the first hearing that was based exclusively on the evidence through September of 2012. Doc. 5.

The ALJ lacked substantial evidence to reject all of the evidence after September 2012 indicating that Plaintiff had deteriorated. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). There is no vocational evidence that, taking into account the deterioration, Plaintiff could perform specific jobs classified as light. Doc. 5. Thus, the ALJ's denial lacks substantial evidence. *Id.* "Despite the deference due to administrative decisions in disability benefit cases, "[Courts] retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir.1981)). On remand, a VE may testify that, even accommodating the additional limitations identified by Plaintiff, his ex-wife, and Dr. Scaglione, there are jobs classified as light that Plaintiff can perform. Light work includes occupations that are primarily sitting or where the weight lifted is negligible if they are either production-paced or involve the use of pedals. 20 C.F.R. §404.1567(b); Dictionary of Occupational Titles ("DICOT") 211.462-010; 559-687-074; 653.687-010. However, it is the ALJ, not the Court, who should elicit and evaluate this vocational evidence in the first instance, or otherwise develop substantial evidence to reject the consistent evidence from Plaintiff, his ex-wife, and/or Dr.

Scaglione. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013). The Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings and proper evaluation of Plaintiff's RFC after September of 2012.

## II.      Procedural Background

On May 30, 2012, Plaintiff applied for SSI and DIB. (Tr. 200-09). On September 18, 2012, the Bureau of Disability Determination ("state agency") denied Plaintiff's application (Tr. 125-33), and Plaintiff requested a hearing. (Tr. 136-38). On March 25, 2014, an ALJ held a hearing at which Plaintiff—who was not represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 39-76).  On June 18, 2014, the ALJ found that Plaintiff was not entitled to benefits. (Tr. 10-29). Plaintiff requested review with the Appeals Council (Tr. 9), which the Appeals Council denied on February 10, 2015, affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-7). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On November 30, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On February 12, 2016, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 4, 5). On March 30, 2016, Plaintiff filed a brief in support

of the appeal ("Pl. Brief"). (Doc. 8). On June 1, 2016, Defendant filed a brief in response ("Def. Brief"). (Doc. 11). Plaintiff did not reply. On November 11, 2016, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.       Standard of Review and Sequential Evaluation Process

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part

404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum*

*v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.     Relevant Facts in the Record

### A. Evidence through September of 2012

The Regulations classified Plaintiff, born in 1963, as a younger individual on the alleged onset date and a person closely approaching advanced age on the ALJ decision date. (Tr. 22); 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a meat cutter, maintenance tech position, and glass mechanic installer. (Tr. 22). On April 9, 2012, Plaintiff "left because he was suing Workmen's Compensation." (Tr. 511).

In November of 2010, Plaintiff underwent surgery in his right knee with good results through March of 2011. (Tr. 336, 339, 341). On April 8, 2011, Plaintiff presented to the emergency room "in severe pain distress" after he reported twisting his knee at work that morning. (Tr. 343). Examination indicated swelling, effusion, decreased range of motion, and tenderness. (Tr. 343). MRI indicated "[a]bnormal medial femoral condyle consistent with spontaneous osteonecrosis versus osteochondral injury…mucinous degeneration…posterior cruciate ligament appears torn." (Tr. 348, 379, 431). Plaintiff stopped working and began reporting back pain. (Tr. 351).

In May of 2011, examination indicated tenderness, abnormal reflexes, decreased range of motion, and antalgic gait with use of a cane and providers ordered lumbar spine MRI. (Tr. 352, 391). This MRI indicated "diffuse degenerative changes…within the lower thoracic and lumbar spine…developmental narrowing of the mid-to-lower lumbar spinal canal… a broad-based disc protrusion with annular tearing… at L5-S1 causing effacement of the anterior epidural fat and a minimal impression on the adjacent thecal sac… moderate narrowing of the thecal sac…a small posterior disc bulge/protrusion at T11-12… moderate progressive neural foraminal narrowing bilaterally at L5-S1…narrowing of the lateral recesses…an overall progression of degenerative changes within the lumbar spine when compared to the previous exam." (Tr. 355, 366, 401). Plaintiff continued exhibiting decreased range of motion, laxity, and positive posterior drawer in his right knee and was referred to physical therapy. (Tr. 368-69).

Plaintiff applied for benefits under the Act and underwent a consultative examination with Dr. Vincent Drapiewski, M.D., on August 1, 2011. (Tr. 381). Plaintiff reported that he was not working and continued to experience back and right knee pain. (Tr. 381, 437). Dr. Drapiewski observed mostly normal findings and opined that Plaintiff could perform a range of light work consistent with the ALJ's RFC. (Tr. 386). A reviewing source, Dr. Leo Potera, MD, reviewed the

record and also opined that Plaintiff could perform a range of light work consistent with the ALJ's RFC. (Tr. 90-92). Dr. Potera cited Plaintiff's normal range of motion and a lack of weakness and atrophy. (Tr. 89, 91).

In September of 2011, Plaintiff's application for benefits was denied. (Tr. 83-95). Plaintiff had undergone injections with a pain management specialist in June and August of 2011 followed by radio frequency lesioning in September of 2011. (Tr. 394-99). Plaintiff's treating orthopedist, Dr. Fanelli, restricted him from working from April of 2011 until July 5, 2011, (Tr. 368-69, 374), limited him to ten pounds lifting and one hour standing at a time at work from July 5, 2011 "until January 1, 2012," (Tr. 437, 445-46), and released him to thirty pounds lifting with breaks every ninety minutes at work on January 3, 2012, despite an abnormal bone scan and instability in the knee. (Tr. 453). Dr. Fanelli recommended surgery. (Tr. 453).

On May 14, 2012, Plaintiff's primary care provider noted Plaintiff's reports of continued right knee pain and observed edema and "end stage" osteoarthritis in the right knee. (Tr. 427). On May 15, 2012, examination indicated pain in the right knee, but full range of motion and no edema. (Tr. 456, 473, 480). Plaintiff underwent the arthroscopy on May 21, 2012. (Tr. 463, 487, 495-501). Eight days post-operatively, Plaintiff exhibited swelling, was placed in a locked knee brace, and was instructed to be non-weight bearing. (Tr. 463). Follow-up in June 2012

indicates that Plaintiff reported continued pain, continued using crutches, was instructed to attend physical therapy, and was instructed to follow-up in five weeks. (Tr. 502). Dr. Fanelli instructed Plaintiff to use "over-the-counter" pain relief, although a medication list printout indicates that narcotics remained among Plaintiff's active medications. (Tr. 301, 503). Plaintiff did not return to follow-up or attend physical therapy. Doc. 5.

In a June 2012 Function Report, Plaintiff reported that medications caused drowsiness. (Tr. 275). He reported that he was still on "crutches" so he had problems driving, bending his knee, walking, and standing. (Tr. 271). He reported problems sleeping, bathing, shaving, and caring for his hair. (Tr. 269). Plaintiff denied having any problems using his hands or reaching. (Tr. 275).

On August 25, 2012, Plaintiff underwent a consultative examination with Dr. Jay Willner, M.D. (Tr. 510). Plaintiff reported he could "lift 50 to 60 pounds," "sit indefinitely," independently dress and perform chores in short intervals. (Tr. 511). Plaintiff identified Flexeril, but no narcotics, as active medications. (Tr. 512). Dr. Willner observed:

> He is able to ambulate; however, he is quite unstable. He is able to get on and off the exam table. He is able to get up and out of the chair. He is able to dress and undress himself.
> …
> SPINE AND EXTREMITIES: Pulses were 2+ bilaterally pedal and radial. No apparent edema, cyanosis, clubbing, swelling, redness, or effusion. Gait was unstable without an assistive device. Grip was 5/5 bilaterally. Range of motion, elbow flexion full range of motion.

Forearm pronation, full range of motion. Wrists, full range of motion. Shoulder forward elevation, backward elevation, abduction, internal rotation, external rotation full range of motion. Cervical spine, full range of motion. Lumbar flexion, full range of motion. Hip, flexion, internal rotation, external rotation, full range of motion. Knees, left full range of motion, right limited to 120 degrees and painful. Straight leg raise was limited in the supine position on the right to 70 degrees. He was very unstable when walking on his heels. He is unable to squat. He was unstable walking on his toes as well as tandem walking, but he did little better with the utilization of his cane.
NEUROLOGIC: Mentation, he is calm, appropriately dressed, good hygiene, and able to follow directions. Affect was appropriate. He was oriented x3. Motor strength was 5/5. Sensory was equal bilaterally with no apparent deficit. Cranial nerves II through XII were grossly intact. Deep tendon reflexes were 2+ in upper and lower extremities bilaterally.

(Tr. 512-13). Dr. Willner did not complete an opinion on Plaintiff's functional limitations. Doc. 5.

On September 13, 2012, Dr. Minda Bermudez, M.D., reviewed Plaintiff's file and authored an opinion. (Tr. 105). Dr. Bermudez opined that Plaintiff could perform a range of light to medium work consistent with the ALJ's RFC. (Tr. 104). Dr. Bermudez relied on Dr. Fanelli's January 3, 2012 opinion that Plaintiff could lift a maximum of thirty pounds with one break every ninety minutes. (Tr. 99). Dr. Bermudez reviewed all of the medical records through September of 2012, along with Plaintiff's Function Report, and opined that Plaintiff was "partially credible." (Tr. 105). Dr. Bermudez crafted her opinion for April 6, 2013, "12 Months after Alleged Onset Date." (Tr. 103).

**B.  Evidence after September of 2012**

On October 19, 2012, in a disability appeals report, Plaintiff reported that changes had occurred since his last Function Report, and that he could not "walk as long and…stand or sit very long." (Tr. 305).

There was no evidence from October of 2012 until March 25, 2014, when Plaintiff and his ex-wife appeared and testified before the ALJ. Doc. 5.  Neither mentioned any limitations or problems relating to the right mallet finger, manipulating, grasping, or handling. (Tr. 39-76). Plaintiff testified that he would suffer excruciating pain in his lower back and right leg after walking about 300 feet. (Tr. 56). His ex-wife testified that he struggled to lift his twenty-five pound granddaughter, "can't really lift anything," walks with a cane, "can't stand long enough" to do dishes, can walk for about fifty feet, and that his condition had deteriorated over the previous eighteen months. (Tr. 65). The ALJ ordered a consultative examination "since it's been so long since [Plaintiff had] treated with anybody, [to] get a fresh opinion." (Tr. 66-67).

The ALJ continued with hypotheticals to the VE. The hypothetical to the VE was essentially an amalgamation of the three medical opinions in the record, with the most restrictive portion in each opinion credited, along with additional limitations. (Tr. 70). The ALJ used Dr. Potera's lifting, carrying, standing, and walking limitations, as they were more restrictive than those assessed by Dr.

Bermudez and Dr. Drapiewski; some of Dr. Drapiewski's postural limitations, as they were more restrictive than those assessed by Dr. Potera or Dr. Bermudez, along with Dr. Drapiewski's opinion that Plaintiff would need a cane to ambulate; added a limitation to no kneeling or crawling, which was more restrictive than all of the medical opinions; added a limitation to no exposure to temperature extremes, humidity, wetness, vibration, dangerous machinery, and uneven surfaces, which was more restrictive than all of the medical opinions; and added a limitation that Plaintiff be allowed to alternate between sitting and standing every twenty to thirty minutes, which was more restrictive than all of the medical opinions. (Tr. 90-92, 103-05, 381-82). The VE testified that jobs would exist at the light level in the national economy as a collator, Dictionary of Occupational Titles ("DICOT") 653.687-010; an inspector, DICOT 559-687-074; and a cashier, DICOT 211.462-010.

On April 10, 2014, Plaintiff underwent a consultative examination with Dr. Philip Scaglione, D.O. (Tr. 519). Plaintiff reported low back and right knee pain along with new symptoms of bilateral lower extremity pain and tingling. (Tr. 519). Plaintiff reported that "he had an injury to his right small finger as a child and this was never treated by any medical practitioner." (Tr. 520). Plaintiff reported decreased activities of daily living compared to 2012, as he indicated that "his ex-wife does the cleaning, laundry, and shopping." (Tr. 520).

Dr. Scaglione observed:

> He is right handed. The claimant appeared to be in moderate distress, secondary to his right knee pain and lower back pain. He has an antalgic gait and leans away from his right side. He can walk on his heels and toes, but with some difficulty. He cannot do a full squat, but he can do 1/4 squat with difficulty. Stance normal. He requires a cane to go even very short distances and cannot go farther than about 10 feet without his cane…He has pinprick anesthesia [decreased sensation] on the anterior aspect of his right knee…Hand and finger dexterity intact, with the exception of a right chronic small finger mallet finger. He is missing approximately the terminal 20 degrees of extension on that digit actively. Grip strength 5/5 bilaterally. Claimant can button, zip and tie, albeit slowly.

(Tr. 521-22). Dr. Scaglione also observed decreased range of motion in his shoulder, right knee, and lumbar spine. (Tr. 532). Dr. Scaglione assessed different limitations for lifting than carrying. (Tr. 524).  Dr. Scaglione opined that Plaintiff could lift up to ten pounds for 1/3 of the day (occasionally), up to twenty pounds for another 1/3 of the day (occasionally), and nothing the remaining 1/3 of the day. (Tr. 524). Dr. Scaglione opined that Plaintiff could carry up to ten pounds occasionally and nothing the remaining 2/3 of the day. (Tr. 524). Dr. Scaglione opined that Plaintiff could sit for up to six hours per day, stand for up to four hours per day, and walk for up to two hours per day, with no stooping, limited use of the hands, and other non-exertional limitations. (Tr. 524-26). The lifting, carrying, and walking limitations were more restrictive than all of the medical opinions from September of 2012 or earlier, along with the ALJ's hypothetical and RFC. (Tr. 524-26).

Plaintiff had also started treating at a free clinic prior to the ALJ hearing. (Tr. 536). These records confirmed that Plaintiff had lacked health insurance and had a referral to an orthopedist pending insurance approval. (Tr. 536-37). Plaintiff reported pain and limitations consistent with the his testimony, ambulated with a cane, reported new symptoms of pain radiating down his left leg, and exhibited decreased motor strength (2 or 3 out of 5) in his right leg for the first time, along with edema in the right knee. (Tr. 538-39). One of his treating sources opined that he could lift and carry weights consistent with the ALJ's RFC, but could only stand or walk for two hours out of an eight-hour workday. (Tr. 17, 556-57).

## V.      Plaintiff Allegations of Error

### A. Dr. Scaglione's Lifting, Carrying, and Walking Limitations

Dr. Scaglione's opinion, like the testimony of Plaintiff and his ex-wife, indicated that Plaintiff had deteriorated since the last medical opinion in September of 2012. (Tr. 524). Dr. Scaglione opined that Plaintiff could lift up to ten pounds for 1/3 of the day (occasionally) and up to twenty pounds for another 1/3 of the day (occasionally). (Tr. 524). Dr. Scaglione opined that Plaintiff could carry up to ten pounds occasionally. (Tr. 524). Dr. Scaglione opined that Plaintiff could sit for up to six hours per day, stand for up to four hours per day, and walk for up to two hours per day, with no stooping, limited use of the hands, and other non-exertional limitations. (Tr. 524-26). The lifting, carrying, and walking limitations were more

restrictive than all of the medical opinions from September of 2012 or earlier, along with the ALJ's RFC. (Tr. 524-26). The ALJ's RFC contemplates that Plaintiff could lift and carry up to ten pounds for 2/3 of the day, and lift and carry up to twenty pounds for the remaining 1/3 of the day. (Tr. 21).

For some portions of Dr. Scaglione's opinion, the ALJ provides no explanation for rejecting them. (Tr. 21). For instance, the ALJ did not acknowledge that Dr. Scaglione's opinion with regard to lifting and carrying contradicted the RFC. (Tr. 21). The ALJ only provided explanations for omitting Dr. Scaglione's walking and stooping limitations. (Tr. 21). An ALJ is prohibited from rejecting evidence for "no reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *see also Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014) (ALJ should "articulate a specific reason" for rejecting opinions, even if source is a consultative examiner rather than a treating source).   The ALJ's lifting and carrying limitations in the RFC lack substantial evidence.

With regard to walking and stooping, the ALJ wrote that:

> Dr. Scaglione reported the claimant with difficulty could perform heel and toe walking, and had normal straight leg raising, no joint deformity, no joint tenderness, no effusion, a stable right knee, no neurologic deficit, normal sensation, no motor deficit, no edema, normal pulses, no muscle atrophy, and normal shoulder, elbow, wrist, hip, cervical spine, and ankle ranges of motion (Exhibit B-16F). Accordingly, Dr. Scaglione's opinion regarding walking and stooping is not supported by his own findings and is inconsistent with the clinical and objective findings of record, and with other substantial evidence. As analyzed above, clinical and diagnostic studies do not

> support his opinion regarding walking and stooping. His limitations
> regarding walking and stooping are inconsistent with the totality of
> the evidence.

(Tr. 21-22). First, the ALJ errs in relying on the absence of some symptoms to find

that the symptoms that do exist were not disabling.  *Carver v. Colvin*, No.

115CV00634SHRGBC, 2016 WL 6601665, at *8 (M.D. Pa. Sept. 14, 2016),

*report and recommendation adopted,* No. 1:15-CV-0634, 2016 WL 6582060

(M.D. Pa. Nov. 7, 2016) ("the absence of some symptoms does not negate the

presence of others"). Plaintiff's normal range of motion in his wrist, elbow, and

cervical spine do not undermine his claimed symptoms, which originate in his

lumbar spine and knee. *Id.*  Moreover, the ALJ mischaracterizes Dr. Scaglione's

findings. *Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981) (ALJ should not

"misconstrue[] the evidence considered"). Dr. Scaglione found that Plaintiff had

decreased range of motion in the shoulder, decreased sensation to pinprick in his

right knee, and loss of dexterity and range of motion in his right hand. (Tr. 521-22,

532).

The 2014 records from the free clinic corroborate Dr. Scaglione's opinion.

(Tr. 536). These records were not submitted to the ALJ. (Tr. 5).  However, the

Court considered them because they are new, material, and were omitted for good

cause.[2] *See Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 834 (3d Cir. 1984). As the ALJ acknowledged, obtaining additional treatment records "may not come about by the time we're ready to make our decision," although the ALJ also indicated that he would "get the updated records." (Tr. 74). Moreover, Plaintiff was unrepresented at the hearing. *See Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 834 (3d Cir. 1984) (Good cause existed where claimant was "now represented by counsel who entered the case after the ALJ's decision"). These records were also new and material. *Id.* These records confirmed that Plaintiff had lacked health insurance and had a referral to an orthopedist pending insurance approval. (Tr. 536-37). Plaintiff reported pain and limitations consistent with the his testimony, ambulated with a cane, reported new symptoms of pain radiating down his left leg and decreased sensation (paresthesias), exhibited decreased motor strength (2 or 3 out of 5) in his right leg for the first time, and exhibited edema in the right knee. (Tr. 538-39). One of his treating sources opined that he could lift and carry weights consistent with the ALJ's RFC, but could only stand or walk for two hours out of an eight-hour workday. (Tr. 17, 556-57). In contrast, the ALJ wrote that "medical examiners reported the claimant had "no neurologic deficit,

---

[2]The Court did not consider the impairment questionnaire by Dr. Paul Sherbondy, M.D., who indicated that he only started treating Plaintiff in October of 2014 and was unable to assess his functional limitations. (Tr. 561-68). This evidence is not material. *See Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 834 (3d Cir. 1984).

normal sensation, no motor deficit, normal straight leg raising, and no edema." (Tr. 21).

Dr. Scaglione's opinion was not entitled to the deference of the treating source rule, but the ALJ is still prohibited for rejecting Dr. Scaglione's opinion for "no reason or the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). The ALJ erred in relying on the absence of some symptoms to negate the impact of present symptoms, so he rejected walking and stooping limitations for the "wrong reason." *Id.* The ALJ provided no explanation, "no reason," to reject many of Dr. Scaglione's limitations, specifically lifting and carrying, which may have limited Plaintiff to only sedentary work and entitled him to benefits after he turned fifty. *Id.*; (Tr. 21).

With regard to Dr. Scaglione's lifting and carrying restrictions, Defendant writes:

> Plaintiff also avers that the ALJ did not fully consider Dr. Scaglione's opinion regarding the lifting/carrying restrictions (Pl.'s Br. at 19). He notes that Dr. Scaglione did not indicate that Plaintiff could frequently lift/carry any weight and that Plaintiff could only occasionally carry 10 pounds (Tr. 524). But, Plaintiff overlooks that Dr. Scaglione also opined that Plaintiff could occasionally lift 20 pounds, which was well within the range of light work (Tr. 524). Similarly, although Dr. Fanelli opined that Plaintiff could not lift greater than 10 pounds, this was in August and October 2011 (Tr. 433, 445). By January 2012, Plaintiff was cleared to lift a maximum of 30 pounds (Tr. 453). And by August 2012, Plaintiff told Dr. Willner that he could lift up to 50 or 60 pounds (Tr. 511). The ALJ also did not dismiss the examination findings or the opinions relating to Plaintiff being limited in standing and walking (Tr. 385, 513-14, 521, 525). As stated above, the ALJ

> recognized that Plaintiff was limited insofar as he found that Plaintiff could only stand and walk 4 hours in an 8-hour workday, could not perform any activity involving lower extremity pedal control, and required the use of a cane for ambulation (Tr. 17).

(Def. Brief at 21-22). Thus, Defendant relies on the medical records from prior to August of 2012. *Id.* However, Defendant's reliance on records from prior to August of 2012 (1) is a post-hoc rationalization; and (2) fails to address whether Plaintiff has deteriorated since August of 2012. *See also Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (Court may not uphold agency action based on post-hoc rationalizations). The ALJ specifically ordered the consultative examination because it had "been so long since [Plaintiff had] treated with anybody" that he needed "a fresh opinion." (Tr. 66-67).

Defendant also errs in writing that an error was harmless because Dr. Scaglione's opinion was "within the range of light work." (Def. Brief at 21-22). First, whether Dr. Scaglione's opinion is within the range of light work depends on vocational evidence, which is absent from the record. Second, a claimant cannot be found disabled simply because they can perform a range of light work. There must be vocational evidence of a specific job title that Plaintiff could perform, existing in sufficient numbers in the economy. *Supra*. A particular range of light work with additional non-exertional limitations, particularly where Plaintiff is prohibited from lifting anything for 1/3 of the day, and prohibited from carrying anything for 2/3 of

the day, may preclude him from performing any specific light work jobs in the national economy. The ALJ, with the benefit of vocational testimony, is in a position to make this determination, while the Court is not. On remand, if the ALJ fails to provide a reason to reject Dr. Scaglione's opinion, the ALJ must elicit vocational evidence that jobs classified in the DOT as light remain given the additional non-exertional limitations. Without the ALJ providing any explanation for rejecting Dr. Scaglione's lifting and carrying restrictions, the Court cannot conclude that substantial evidence supports the ALJ's RFC with regard to lifting and carrying or that any error was harmless.

## B. Credibility

The Court also recommends remand for evaluation of Plaintiff's credibility. The ALJ relied on three factors to discount Plaintiff's credibility: a lack of objective medical evidence, conservative treatment, and activities of daily living. Plaintiff's activities of daily living are performed on a sporadic and transitory basis. *Wright v. Sullivan,* 900 F.2d 675, 682 (3d Cir.1990) (*quoting Smith v. Califano,* 637 F.2d 968, 971 (3d Cir.1981) ("disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity…sporadic or transitory activity does not disprove disability"). The ALJ erred in relying on Plaintiff's conservative treatment given Plaintiff's explanation that he lacked insurance and was waiting for an orthopedics referral

before getting prescription pain medication. *See* SSR 96-7p. This leaves only a lack of objective medical evidence, which, as a matter of law, may not be the only reason to make an adverse credibility finding. *See* 20 C.F.R. § 416.929(c)(2) ("we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work…solely because the available objective medical evidence does not substantiate your statements").

Other factors exist in the record that could have supported the ALJ's credibility analysis. For instance, Plaintiff's statement that he stopped working so that he could sue for workers compensation, not because his impairments were disabling, can be an adverse credibility factor. (Tr. 17-22). *Buckner v. Colvin*, No. 1:15-CV-00175-YK-GBC, 2016 WL 1621993, at *15 (M.D. Pa. Mar. 30, 2016), *report and recommendation adopted*, No. 1:15-CV-175, 2016 WL 1595346 (M.D. Pa. Apr. 21, 2016) "Separation from the workforce for non-disability related reasons is relevant to credibility") (citing *Hogan v. Apfel,* 239 F.3d 958 (8th Cir.2001) (The closeness in time of plaintiff's on-the-job reprimand to her ceasing work cast doubt on her assertion that she quit her job because of pain and side effects of her pain medication); *Kane v. Colvin,* No. 3:13–CV–02469, 2015 WL 1513960, at *12 (M.D.Pa. Mar. 31, 2015) (noting that the plaintiff reported she was laid off because there was "not enough work for her," not because she was

unable to work due to disability); *Pachilis v. Barnhart,* 268 F.Supp.2d 473, 483 (E.D.Pa.2003) (finding that a claimant incentive or disincentive to work is a permissible criterion bearing on his credibility)). Similarly, Plaintiff's overall claims contained inconsistencies, as he had alleged in the past that he was disabled but returned to work after his application for benefits was denied. SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record"). However, the ALJ did not rely on these factors in the decision. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (Court should evaluate reasoning contained in administrative decision, not post-hoc rationalizations). The Court recommends remand for the ALJ to develop substantial evidence to find Plaintiff less than fully credible.

### C. Alleged inconsistency between RFC and definition of light work

Plaintiff asserts that the ALJ's RFC and various opinions contradict the regulatory definition of light work. (Pl. Brief). Neither the ALJ's RFC nor any of the opinions inherently conflict with light work. The ALJ found that Plaintiff could perform:

> [L]ight work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift and carry 20 pounds occasionally and 10 pounds frequently. He can stand and walk 4 hours in an 8 hour workday. He can sit 6 hours in an 8 hour workday. He is limited to no right lower extremity pedal control. He needs a sit-stand option every 20 to 30 minutes. He can occasionally bend, balance, stoop, and climb ramps

and stairs. He cannot kneel, crouch, crawl, or climb, ladders, ropes, and scaffolds. He needs to use a cane for ambulation. He cannot be exposed to temperature extremes, vibration, humidity, or wetness. He cannot be exposed to unprotected heights, dangerous machinery, or uneven surfaces. He is limited to simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes.

(Tr. 17). The ALJ relied on VE testimony that a claimant with this RFC could perform light jobs in the national economy, specifically as a collator, an inspector, and a cashier,   DICOT 211.462-010; 559-687-074; 653.687-010. (Tr. 70-71).

The ALJ may rely on VE testimony unless the VE testimony conflicts with "the regulatory definitions of exertional levels," which "are controlling." SSR 00-4p (citing 20 C.F.R. §404.1567). Plaintiff asserts that the RFC contradicts the definition of light work, but cites only SSR 83-12, which provides that, "generally," light work has certain requirements. (Pl. Brief at 17-18). "SSR 00-4p refers to the Regulations, not SSR 83-10 to define light work." *Hamm v. Colvin*, No. 1:15-CV-00778-YK-GBC, 2016 WL 6246837, at *11 (M.D. Pa. Sept. 30, 2016), *report and recommendation adopted,* No. 1:15-CV-778, 2016 WL 6216147 (M.D. Pa. Oct. 25, 2016). The regulatory definition of light work states that:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though **the weight lifted may be very little**, a job is in this category when it requires a good deal of walking or standing, or when it involves **sitting most of the time** with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that

he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §404.1567(b) (emphasis added). The regulatory "terms have the same

meaning as they have in the exertional classifications noted in the DOT." SSR 00-

4p. For each job identified by the VE in this case, the DOT provides that:

> Light Work - Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though **the weight lifted may be only a negligible amount**, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires **sitting most of the time** but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires **working at a production rate pace** entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

DICOT 211.462-010; 559.687-074; 653.687-010 (emphasis added).

Plaintiff argues that light work requires six hours or more of standing. (Pl.

Brief at 18). However, light work includes any work with a "good deal" of

standing. 20 C.F.R. §404.1567(b); DICOT 211.462-010; 559.687-074; 653.687-

010. Moreover, fast-paced work or work involving pedals that involves sitting

"most of the time" is considered light work. *Id.*; *see also Palmer v. Colvin*, No.

115CV00704SHRGBC, 2016 WL 5817240, at *15 (M.D. Pa. Aug. 25, 2016),

*report and recommendation adopted,* No. 1:15-CV-704, 2016 WL 5787354 (M.D.

Pa. Oct. 4, 2016) ("Although light work is typically considered to require six hours of standing or walking in an eight hour workday, this is not consistent with the regulatory definitions."). Light work does not always require six hours of standing.

Plaintiff argues that all light jobs require the maximum possible lifting for light jobs, namely, lifting twenty pounds occasionally and ten pounds frequently. (Pl. Brief at 17-18). However, the Regulatory definition only requires that light work involve lifting amounts "up to" this amount. 20 C.F.R. §404.1567(b); DICOT 211.462-010; 559-687-074; 653.687-010. "The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p. The amount lifted may be "negligible" if, as noted above, the work requires a "good amount" of standing, is fast-paced, or requires the use of hand and foot pedals. 20 C.F.R. §404.1567(b); DICOT 211.462-010; 559-687-074; 653.687-010. Lifting up to twenty, or even ten, pounds is not required for light work.

Plaintiff must demonstrate that the VE testimony conflicted with the "regulatory definition" contained in the Regulations at 20 C.F.R. §404.1567, or the definitions actually contained within the DOT, not SSR 83-12, which only notes

that light work "generally" has other requirements. SSR 00-4p. The Court does not recommend remand on these grounds.

### D. Right small finger mallet finger

Plaintiff notes that the ALJ found Plaintiff's right small mallet finger to be a severe impairment, but did not include manipulative limitations in the RFC. (Pl. Brief). Not all severe impairments cause limitations significant enough to be included in the RFC. Plaintiff does not "seriously argue" that mallet finger in his right small finger would preclude him from performing any of the jobs identified by the VE. *Zirnsak v. Colvin*, 777 F.3d 607, 618 (3d Cir. 2014) (Claimant did not "seriously argue" limitations would preclude her from performing the jobs identified by the VE where "she dedicate[d] only one line of her brief to this issue"). Aside from Dr. Scaglione's examination, Plaintiff does not identify any medical treatment record, consultative examination, or other evidence where he complained of pain or limitations related to his finger. (Pl. Brief). Dr. Scaglione opined that Plaintiff had manipulative limitations, but all of the other medical experts opined that he had no manipulative limitations. (Tr. 90-92, 103-05, 381-82). The Court does not recommend remand on these grounds.

### E. Dr. Fanelli's opinion

In passing, Plaintiff writes "[i]n response to Plaintiff's statement at his hearing that the last lifting restriction he was given by Dr. Fanelli was 10 pounds,

the ALJ said that he did not see such a restriction in the record. It is, however, part of the doctor's work note which also provided that Plaintiff would need multiple breaks to sit. See Tr. 446, 56." (Pl. Brief at 19). Plaintiff testified that the Dr. Finelli had limited him to lifting no more than ten pounds, and the ALJ responded, "Okay. I didn't see that in the record, but that doesn't mean—he suggested no more than 10 pounds? …Okay." (Tr. 56). Review of the record indicates that Dr. Fanelli, restricted him from working from April of 2011 until July 5, 2011, (Tr. 368-69, 374), limited him to ten pounds lifting and one hour standing at a time at work from July 5, 2011 "until January 1, 2012," (Tr. 437, 445-46), and released him to thirty pounds lifting with breaks every ninety minutes at work on January 3, 2012, despite an abnormal bone scan and instability in the knee. (Tr. 453). The opinion Plaintiff references expired on January 1, 2012, well before the relevant period, and does not support Plaintiff's claim. The Court does not recommend remand on these grounds.

### F.  Obesity

Plaintiff writes that:

> Finally, the ALJ does not acknowledge that Plaintiff suffers from obesity, an impairment specifically mentioned by Dr. Fanelli (Tr. 368). As Plaintiff was unrepresented before the ALJ – and since the Third Circuit has been observed that obesity generally exacerbates joint dysfunction – surely, the ALJ had a duty to analyze this impairment and its effect on Plaintiff's residual functional capacity. See generally Diaz v. v. Commissioner, 577 F.3d 500, 504 (3d Cir. 2009); Social Security Ruling 02-1p.

(Pl. Brief at 20). Plaintiff may not have been represented at the hearing, but he is represented now. (Pl. Brief).  Step two is a threshold test, so when the evaluation process proceeds past step two, a claimant alleging an error at step two must articulate the harmful impact this had on subsequent steps. *See Shinseki v. Sanders*, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L. Ed. 2d 532 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination") (citing *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997) (Social Security claimant must demonstrate prejudice by ALJ error)) (other internal citations omitted). In *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005), the Third Circuit held that a "generalized response" that obesity makes it "more difficult…to stand, walk and manipulate [the] hands and fingers" was "not enough to require a remand" based on an error at step two. *Id.* at 553. The standard presented in *Rutherford* is essentially a briefing issue. *Id*. Plaintiff must allege in the briefs that an error in assessing obesity was harmful by providing more than just a general response. *Id*. Plaintiff's briefs fail to do so here, so Plaintiff has failed to meet his burden of showing that any error was harmful. The Court does not recommend remand on these grounds.

The Court declines to address Plaintiff's other allegations. A remand may produce different results on these claims, making discussion of them moot.  *See*

*LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

### G. Remedy

Remand, rather than reversal and award of benefits, is the appropriate remedy in this case. *See Markle v. Barnhart*, 324 F.3d 182, 189 (3d Cir. 2003) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotations omitted)).

### VI.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's benefits under the Act be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within

fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: January 27, 2017                    _____s/Gerald B. Cohn_____
                                           GERALD B. COHN
                                           UNITED STATES MAGISTRATE JUDGE